Jones, Chief Judge,
delivered the opinion of the court:
This suit arises out of a war contract that was terminated for the convenience of the Government. It was terminated *552 August 14, 1945, at the time of the ending of the war with Japan. It involves a dispute as to the amount of damages to which plaintiffs are entitled under the Contract Settlement Act of 1944, 58 Stat. 649, 661. It reaches this court under § 13 (c) (3) of that act.
Pertinent provisions of the contract out of which the dispute arose are contained in article 17 of the contract and are set out in detail in finding 3. These provisions set out the nature of the items which shall be included.
The contract, dated January 10, 1945, called for the manufacture and delivery of 7,500 squad tents at a unit price of $46.68, during the period of January to September 1945. The defendant was to furnish all materials, with minor stated exceptions. These materials included fire and mildew resistant cloth (duck and twill), webbing, thread, rope, galvanized rings, wire slips, and wrapping twine. The contract was modified by adding a provision calling for 2,950 additional squad tents at a unit price of $42.52, with the delivery schedule extended through December 1945. Later this schedule was extended through February 1946, and the unit price included in the modification was increased 61 cents per unit.
By telegram dated August 14, 1945, the contract was terminated to the extent of 5,500 units for the convenience of the Government, and by telegrams of September 18 and September 20,1945, the contract was completely terminated for the convenience of the Government as to all units that had not then been fabricated.
Plaintiffs submitted a termination settlement proposal which, after revision, was in the sum of $51,795.88.
During the latter part of 1944 the need of the Army for squad tents became very great and the available facilities of manufacturers were inadequate to meet the increased demands for production by the Quartermaster Corps. The officials of the Depot Quartermaster’s purchasing department urged plaintiff Schultz to increase production by additional facilities. On October 20, 1944, plaintiff Schultz received a telegram from the Jeffersonville Depot Quartermaster as follows:
*553 Necessary you come to Jeffersonville 20 Oct. reference increase production tents squad reservations already made Brown Hotel
It was not feasible to expand the facilities in St. Louis because of the lack of available space and the high wages prevailing there. It was finally found that a two-story brick building in Litchfield, Illinois, was available and could be made suitable for the production of squad tents. The first floor of the building had been used as a funeral parlor and the second floor as an apartment. It was in a run-down condition. The electric wiring, plumbing, and heating systems were very limited and were in poor condition.
After negotiations, the plaintiffs leased the particular building for a two-year period, with renewal privileges, and spent for the purpose of putting the building in proper condition for operation the sum of $28,923.47; The performance period of the contract in issue as amended was for a period of 14 months. It was actually terminated at the end of about 9 months. After the termination, sometime during the year 1946, the plaintiffs entered into a contract for the continuation of certain manufactures for civilian use in this particular building.
One of the items in dispute is the percentage of the cost of improvement that should be allotted to the particular contract which is in issue. The plaintiffs claimed that 50 percent of this particular expense should be included as an item of cost. The Government insists that a very small percentage of this improvement expense should be charged to the Government.
The trial commissioner who heard the evidence has found that the amount of the cost of this particular item that should be charged to the Government should be 20 percent of the total expense, or 40 percent of the amount of plaintiffs’ reduced allotment claim. This seems fair and reasonable and we have approved the finding.
The various items which should be included in plaintiffs’ claim are set out in the findings and will not be repeated here. It has been largely a matter of auditing these items in the light of the findings of- fact and our auditors have *554 gone over tbe findings and also over the evidence in connection therewith. One of the provisions of the Contract Settlement Act of 1944 (Title 41 U. S. C. § 106 (d) (1)) which is applicable in determining fair compensation for termination claims which are not settled by agreement takes into account
the direct and indirect manufacturing, selling and distribution, administrative and other costs and expenses incurred by the war contractor which are reasonably necessary for the performance of the war contract and properly allocable to the terminated portion thereof under recognized commercial accounting practices;
In the light of the entire record we find that the amount of the additional costs to which plaintiffs are entitled is the sum of $35,469.65. Against this amount the defendant is entitled to credits for materials which plaintiffs were permitted to retain and for which the Government should be credited by offsets in the aggregate sum of $35,209.73. The net amount due plaintiffs after subtracting the offset is $259.92.
The plaintiffs claim that they are entitled to interest on the net amount for the period beginning 30 days after the termination of the claim. Subsection (f) of section 106, Title 41 U. S. C. stipulates that interest on the amount due and unpaid from time to time on any termination claim under a prime contract shall be allowed at the rate of 2y2 percent per annum for the period beginning 30 days after the date fixed for termination and ending with the date of final payment, except that if the prime contractor unreasonably delays the settlement of his claim, interest shall not accrue for the period of such delay.
The record is in such a confused state as to which side is responsible for the delay and whether one or both have the primary responsibility, that we do not think interest should be allowed in the circumstances.
Plaintiffs are entitled to judgment in the sum of $259.92.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
*555 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiffs, Ernst Henry Schultz, Jr., and James Vernor Dunbar, now deceased, were co-partners doing business as the General Canvas Company, Litchfield, Illinois.
2. This suit is brought pursuant to Section 13 of the Contract Settlement Act of 1944 (Public Law 395,78th Congress, 58 Stat. 649,41U. S. C. 113). Section 13 (c) (3) of the act provides in part:
Notwithstanding any contrary provision in any war contract, the Appeal Board or court shall not be bound by the findings of the contracting agency, but shall treat such findings as prima facie correct, and the burden shall be on the war contractor to establish that the amount due on his claim or part thereof exceeds the amount allowed by the findings of the contracting agency. Whenever the Appeal Board or court finds that the war contractor failed to negotiate in good faith with the contracting agency for the settlement of his claim or part thereof before appeal or suit thereon, or failed to furnish to the agency any information reasonably requested by it regarding his termination claim or part thereof, or failed to prosecute diligently any protest or appeal required to be taken under subsection (c) (1) (ii) of this section, the Appeal Board or court (i) may refuse to receive in evidence any information not submitted to the contracting agency; (ii) may deny interest on the claim or part thereof for such period as it deems proper; or (iii) may remand the case to the contracting agency for further proceedings upon such terms as the Appeal Board or court may prescribe. Unless the case is remanded, the Appeal Board or court shall enter the appropriate award or judgment on the basis of the law and facts, and may increase or decrease the amount allowed by the findings of the contracting agency.
3. The plaintiffs seek compensation, in addition to that allowed by the Government contracting agency (the Chicago Army Quartermaster Depot), for the termination of a fixed-price contract, negotiated under the First War Powers Act, 1941, for the production of squad tents as hereinafter de *556 scribed. The contract was terminated for the convenience of the United States pursuant to article 17 of the contract, which provides in part as follows:
17. Termination at the Option of the Government.— (а) The performance of work under this contract may be terminated by the Government in accordance with this Article in whole, or from time to time in part, whenever the contracting officer shall determine any such termination is for the best interests of the Government. Termination of work hereunder shall be effected •by delivery to the contractor of a Notice of Termination specifying the extent to which performance of work under the contract shall be terminated, and the date upon which such termination shall become effective. * * *
(b) After receipt' of a Notice of Termination and except as otherwise directed by the contracting officer, the contractor shall (1) terminate work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services or facilities except as may be necessary for completion of such portions of the work under the contract as may not be terminated; (3) terminate all orders and subcontracts to the extent that they relate to the performance of any work terminated by the Notice of Termination; (4) assign to the Government, in the manner and to the extent directed by the contracting officer, all of the right, title and interest of the contractor under the orders or subcontracts so terminated; (5) settle all claims arising out of such termination of orders and subcontracts with the approval or ratifications of the contracting officer to the extent that he may require, which approval or ratification shall be final for all the purposes of this Article; (б) transfer title and deliver to the Government in the manner, to the extent and at the times directed by the contracting officer (i) the fabricated or unfabricated parts, woA in process, completed work, supplies and other material produced as a part of, or acquired in respect of the performance of, the work terminated in the Notice of Termination, and (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government; (7) use his best efforts to sell in the manner, to the extent, at the time, and at the price or prices directed or authorized by the contracting officer, any property of the types referred to in subdivision (6) of this paragraph provided, however, that the contractor *557 (i) shall not be required to extend credit, to any purchaser and (ii) may retain any such property at a price or prices approved by the contracting officer; (8) complete performance of such part of the work as shall not have been terminated by the Notice of Termination; and (9) take such action as may be necessary or as the contracting officer may direct for protection and preservation of the property, which is in the possession of the contractor and in which the Government has or may acquire an interest.
(c) The contractor and the contracting officer may agree upon the whole or any part of the amount or amounts to be paid to the contractor by reason of the total or partial termination of work pursuant to this Article, which amount or amounts may include a reasonable allowance for profit, and the Government shall pay the agreed amount or amounts. * * *
(d) In the event of the failure of the contractor and contracting officer to agree as provided in paragraph (c) upon the whole amount to be paid to the contractor by reason of the termination of work pursuant to this Article, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (c), shall pay to the contractor the following amounts.
(1) For completed articles delivered to and accepted by the Government (or sold or retained as provided in paragraph (b) (7) above) and not theretofore paid for, forthwith a sum equivalent to the aggregate price for such articles computed in accordance with the price or prices specified in the contract;
(2) In respect of the contract work terminated as permitted by this Article, the total (without duplication of any items) of (i) the cost of such work exclusive of any cost attributable to articles paid or to be paid for under paragraph (d) (1) hereof; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders as provided in paragraph (b) (5) above, exclusive of the amounts paid or payable on account of supplies or materials delivered or services furnished by the subcontractor prior to the effective date of the notice of termination of work under this contract which amounts shall be included in the cost on account of which payment is made under subdivision (i) above; and (iii) a sum equal to two (2) % of the part of the amount determined under subdivision (i) which represents the cost of articles or materials not processed by the contractor, plus a sum equal to eight (8) % of the *558 remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under subdivision (i), which for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings;
(3) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (b) (9) hereof; and any other reasonable cost incidental to termination of work under this contract, including expense incidental to the determination of the amount due to the contractor as the result of the termination of work under this contract.
*****
(h) For the purposes of paragraph (d) (2) and (d) (3) hereof, the amounts of the payments to be made by the Government to the contractor shall be determined in accordance with the Statement of Principles for Determination of Costs upon Termination of Government Fixed Price Supply Contracts approved by the Joint Contract Termination Board, December 31, 1943, as amended by regulation No. 5 of the office of Contract Settlement dated September 30, 1944. The contractor for a period of three years after final settlement under the contract shall make available to the Government at all reasonable times at the office of the contractor all of its books, records, documents, and other evidence bearing on the costs and expenses of the contractor under the contract and in respect of the termination of work thereunder.
The statement of principles for determination of costs upon termination of Government fixed-price supply contracts, cited in article 17 (h) of the contract, contains the following provisions:
1. General Prineifles. The costs contemplated by this Statement of Principles are those sanctioned by recognized commercial accounting practices and are intended to include the direct and indirect manufacturing, selling and distribution, administrative, and other costs incurred which are reasonably necessary for the performance of the contract, and are properly allocable or apportionable, under such practices, to the contract (or the part thereof under consideration). The general principles set out in this statement are subject to the application of any special provisions of the contract. Certain costs are specifically described below because of *559 their particular significance, and, as in the case of other costs, should be included to the extent that they are allo-cable to or should be apportioned to the contract or the part thereof under consideration.
* * ^ * *
(g) Special Leases. (1) Rentals under leases clearly shown to have been made for the performance of the contract, or the contract and other war-production contracts, covering the period necessary for complete performance of the contract and such further period as may have been reasonably necessary; (2) costs of reasonable alteration of such leased property made for the same purpose; and (3) costs of restoring the premises, to the extent required by reasonable provisions of the lease; less (4) the residual value of the lease; provided that the contractor shall have made reasonable efforts to terminate, assign, or settle such leases or otherwise reduce the cost thereof.
* * * *
(k) Settlement Expenses. Reasonable accounting, legal, clerical, and other expenses necessary in connection with the termination and settlement of the contract and subcontracts and purchase orders thereunder, including expenses incurred for the purpose of obtaining payment from the Government only to the extent reasonably necessary for the preparation and presentation of settlement proposals and cost evidence in connection therewith.
(k) (2) Initial Costs. Costs of a nonrecurring nature which arise from unfamiliarity with the product in the initial stages of production should be appropriately apportioned between the completed and the terminated portions of the contract. In this category would be included high direct labor and overhead costs, including training, costs of excessive rejections and similar items.
4. The contract, No. W-12-036 qm. 11416, dated January 10, 1945, was accepted by plaintiffs on January 26, 1945, and called for the manufacture and delivery of 7,500 squad tents at a unit price of $46.68, during the period of January to September 1945. The Government was to furnish all materials, except spur-type brass grommets with washers and packing material. The Government-furnished materials consisted of fire and mildew resistant cloth (duck and *560 twill), webbing, thread, rope, galvanized rings, wire slips and wrapping twine.
Modification B called for 2,950 additional squad tents at a unit price of $42.52, with the delivery schedule extended through December 1945. By modification E, dated June 21, 1945, the delivery schedule was extended through February 1946. The unit price was increased 61 cents by modification C. By telegram dated August 14, 1945, the contract was partially terminated to the extent of 5,500 units for the convenience of the Government. This partial termination was consummated by modification agreement F which provided that a settlement agreement would be executed later “and the contractor is fully aware of all of his rights under the Contract Settlement Act of 1944 and the contract article entitled ‘Termination at the Option of the Government’.”
By telegraphic advices on September 18 and September 20,1945, the contract was completely terminated for the convenience of the Government as to all units not yet fabricated. The complete termination was carried out in modification agreement J. The basic data on the contract, as subsequently modified, are summarized as follows:

The following units and amounts represent the terminated and completed portions of the contract as modified:

The plaintiffs were paid $201,873.56. $2,749.29 was withheld pending settlement of the termination claim.[1]
*561 5. Prior to 1944 plaintiffs Schultz and Dunbar were president and secretary, respectively, and directors of the Canvas Products Company, a corporation, which had two plants in St. Louis, Missouri. The corporation had a long history in the manufacture of canvas products prior to 1944. It had been in the business of manufacturing civilian canvas goods prior to World War II. In 1941 it embarked upon the manufacture of heavy canvas goods, including but not limited to squad tents for the Government under contracts with the Quartermaster Corps. During the war, its Fourth Street factory was exclusively in war production, while its Seventh Street factory continued some civilian production until it became impossible to obtain materials, when it was also switched over to war production.
6. During the latter part of 1944 the need of the Army for squad tents became very great and the available facilities of manufacturers were inadequate to meet the increased demands for production by the Quartermaster Corps. Officials of the Depot Quartermaster’s purchasing department urged plaintiff Schultz to increase production by additional facilities. On October 20,1944, Schultz received a telegram reading “Necessary you come to Jeffersonville 20 Oct. reference increase production tents squad reservations already made Brown Hotel.”
The expansion of the facilities of the Canvas Products Company in St. Louis was not feasible because of the lack of available space and the high wages prevailing there. By advertising in a local paper and with the cooperation of the Chamber of Commerce, Litchfield, Illinois, the plaintiffs located a two-story brick building, 66' x 110', at the corner of Eyder and Madison Streets in Litchfield, owned by Albert T. and Eva T. Carroll, and known as the Carroll Building. The building was surveyed by the plaintiffs and by Chester E. Abresch, who was the production engineer at the Fourth Street plant of the Canvas Products Company, and it was determined that the building could be made suitable for the production of squad tents. The first floor of the building had been used as a funeral parlor and the second floor as an apartment. The entire building was in a run-down condition and appeared to have been vacant for several years. The electric *562 wiring, plumbing and beating systems were very limited and in poor condition and one of tbe soil pipes appeared to empty into tbe basement anea on the concrete floor.
7. Tbe plaintiffs conducted negotiations with tbe owners for a lease on the building at tbe office of the Litchfield National Bank. Mr. Fleming, a bank official, participated. A rental agreement was prepared, providing a two-year lease on tbe building. Tbe bank agreed to finance tbe repairs and improvements and the rental agreement provided a rate of $200 per month, plus one twenty-fourths of the total cost for repairs and improvements. Immediately following tbe negotiations for tbe lease of the building, tbe plaintiffs conferred with H. E. Kennedy, a local contractor who was recommended for tbe work on the building. Kennedy examined tbe Carroll Building and was taken to St. Louis to inspect the production layout in tbe plants of Canvas Products Company. Kennedy advised the plaintiffs that to adopt a similar layout in tbe Carroll Building would cost an estimated $45,000 to $50,000 and would practically rebuild tbe Carroll Building.
By letter of December 9, 1944, plaintiff Dunbar wrote Albert T. Carroll, in part, as follows:
Enclosed find drafts for release and drafts of tbe options for renewal. Tbe amount of tbe rental for the first two years is to be $200.00 a month plus 1/24 of tbe amount of money that is being expended for our improvements on tbe property.
Tbe final lease agreement, as reported in tbe following finding, contained no provision for prorating tbe cost of improvements. No release agreement was filed in this case.
8. Tbe lease for the Carroll Building, executed by the owners and tbe plaintiffs herein, reads in part:
This Indenture, made as of tbe 5th day of December, 1944, between Albert T. Carroll and Eva T. Carroll, bis wife, as Lessors, and Ernst H. Schultz, Jr. and James V. Dunbar, Co-partners doing business as General Canvas Company, as Lessees, * * *
To be occupied by Lessees as a factory and warehouse for manufacturing and handling of canvas goods for and during the term commencing tbe 2nd day of January, 1945 and ending on the 1st day of January, 1947, upon tbe terms and conditions hereinafter set forth.
*563 Fibst : To pay Lessors at the Lessees office in Litch-field, Illinois, as rent for said premises for said term the sum of Four Thousand Eight Hundred Dollars ($4,800.00), payable in advance in equal monthly installments of Two Hundred Dollars ($200.00) upon the 1st day of each and every month during the term hereof.
SecoNd : All repairs and alterations deemed necessary by Lessees and which are not required to be made by Lessors under the terms of this lease shall be made by Lessees at its own cost and expense, but all such repairs and alterations so made shall be the property of the Lessee unless the removal of the same would work substantial damage to the premises, and in such event Lessees shall have the option of repairing such damage and retaining said repairs and alterations as its own property or of leaving the repairs and alterations as part of the real estate.
Thied: The Lessors shall during the term of this lease keep the roof, gutters, downspouts, exterior walls, exterior woodwork and exterior metalwork, in good condition and repair, and will comply with all the statutes and municipal ordinances regulating the same, provided Lessees shall notify Lessors in writing of such repairs to be made. Lessors warrant that all of said parts of said demised premises shall be in good condition and repair and in good working order at the time of the occupancy by the Lessees. * * *
The above lease and the memorandum agreement, hereinafter described, were recorded in Montgomery County, Illinois, September 5,1945.
9. Plaintiffs and the owners of the Carroll Building also executed a memorandum of agreement dated December 8, 1944, reciting that “Lessors and Lessees have entered into a lease dated the 1st day of December, 1944,” which obviously refers to the original lease that was supplemented by the one dated December 5, 1944, in the preceding finding.
Under the terms of the agreement, the lessees had the following options: (1) option for an additional period of five years at the same rental of $2,400 per year, provided lessees shall give written notice on or before December 1, 1946; (2) an alternative option to extend the lease for an additional term of ten years from the date of expiration of said lease at the same yearly rental, provided written notice be given on or before December 1,1946; (3) option to extend *564 the lease for an additional period of five years from either of the two foregoing extended periods, provided written notice of same be given on or before December 1, 1951, or December 1,1956.
10. The partnership, General Canvas Company, was formed “for the purpose of entering into the canvas goods industry,” pursuant to an agreement ’ dated December 1, 1944, between plaintiffs Schultz and Dunbar. Each of the two partners contributed $15,000 of capital, and profits and losses were to be shared equally. The agreement provided, among other things, for the withdrawal of either partner upon giving three months’ notice in writing and that Schultz would fix the valuation of the assets and the payment of the share to the withdrawing partner. Schultz was empowered to dissolve the partnership at any time, subject to the distribution of assets at values appraised by him. All disputes were to be submitted to Schultz for his decision which was to be final.
The plaintiffs realized the risk involved in opening a new plant and did not wish to jeopardize the financial condition of the Canvas Products Company by starting out on another venture. Both of the plants in St. Louis were operated on a profitable basis at that time. The principal stockholders were represented by two trusts created by Schultz’s father and uncle, and he did not feel justified in obligating the Canvas Products Company with the risks of opening a new plant and organizing the necessary labor force required.
The wage scale for the manufacture of canvas products was substantially below the prevailing scale for other war industries and the Canvas Products Company experienced a very great turnover in its labor force. In attempting to organize two shifts of 200 people in its plants during 1943, it had a labor turnover of approximately 1,600 in one month. By establishing the new plant in a small town, plaintiffs hoped to avoid this heavy labor turnover.
11. As soon as plaintiffs located the Carroll Building and determined its suitability for conversion into a plant for the manufacture of squad tents, Schultz made a trip to the office of the Depot Quartermaster in Jeffersonville and advised the procurement officials, described the building to *565 them and commenced negotiations for a contract. At that time Graden Causey was the principal procurement specialist and Glen A. White was procurement specialist in the textile branch which included squad tents. Both officers were under Major John Wilson, Jr., the contracting officer. Plaintiff Schultz conducted the oral negotiations and arrived at a tentative price about the end of November 1944.
The first bid submitted was one for $57 per unit, and the cost and price analysis branch recommended that a rede-termination-of-price clause be included in any award for this amount. This would require periodic audits by the Government for the determination of production costs about every month or six weeks during the performance period. Schultz was averse to the redetermination-of-price clause, requiring repeated Government audits at the plant, and negotiations were continued which resulted in the submission of a bid at a fixed price, as reported in the following finding.
12. By letter of December 11, 1944, Schultz submitted a bid on behalf of the General Canvas Company for the manufacture of 6,700 squad tents at a unit price of $46.84, plus 34 cents in the event that the contractor furnished spur-type grommets. All other materials, except packing, were to be furnished by the Government. The bid was prepared on the War Department standard procurement form No. 2, dated December 9, 1944, and contained the following estimated unit cost breakdown:
Direct labor, cutting_$0. 85
Direct labor, sewing_21. 07
Indirect factory expense:
Indirect labor_ 1.49
AH otter_10.53
Administrative and general expense_ 8.19
Total costs___42.13
Profit (10% of total cost)_ 4.21
Total proposed unit price_46.34
The bid form contained the question of whether or not the prevailing wage rates were used in estimating the direct labor in the unit cost breakdown, after which the following *566 entry was made: “None prevailing. No experience — new plant.”
The proposed delivery schedule was 100 in February, 200 in March, 400 in April, and 1,200 each month from May through September 1945.
The bid contained the following supplementary information, as required on the bid form:
Employees currently employed-None.
Employees employed in 1940- None.
Proposed to employ_ 110 . additional employees and work 1 shift of 8 hours each, 5 days per week.
Cost of Government-owned facilities_No Government-owned facilities.
Contractor’s need of (a) additional Government facilities and (b) additional contractor-owned facilities for performance of proposed con-tract_ None.
13. The plaintiff’s bid estimate was reviewed by the cost and price analysis branch, which submitted its report under date of December 19,1944. That report, which was referred to by witnesses Causey and Schultz, read in part:
2. On the basis of the above comments contractors’ cost will run about $39.00 if he keeps his labor at $21.07 leaving a profit margin of 18%. However, contractors’ labor is stated quite low; he has many risks in starting up so this margin is not considered unreasonable under the circumstances.
:ji * * * *
4. Contractor should be requested to furnish a list of his commitments, such as items and amounts of machinery to be purchased, leases entered into, and any other like expenditures for which the contractor would claim reimbursement in pretermination or termination.
5. The contractors’ original proposal on this procurement was in the amount of $57.00 per unit subject to price redetermination, upward or downward, under PE 341.2. Negotiation resulted in submission of the above bid.
There is no evidence that the Government made any request for plaintiffs’ commitments. All such information had *567 been fully disclosed to the Government officials beforehand. Mr. Causey had inspected the Carroll Building once with Schultz and understood that all building improvement costs with amortization over the life of the contract were included in the bid price.
On December 28, 1944, the Jeffersonville Quartermaster Depot wired the General Canvas Company, advising that it had been awarded a contract for 8,000 squad tents with deliveries from January through September 1945. On the same day a form letter was sent by Graden D. Causey to plaintiffs and other contractors for squad tents, advising them of the different types of materials being shipped as substitutions for the types described in the original bill of materials to be furnished by the .Government and that the inspection zones would be notified of the changes. Government bills of lading issued January 4, 1945, show the shipment of certain Government-owned materials from the Jeffersonville Quartermaster Depot to the General Canvas Company at Litchfield, Illinois.
The contract, heretofore described in findings 3 and 4, was issued January 10, 1945, for 7,500 squad tents at the unit bid price in plaintiffs’ proposal of December 9, 1944.
14. Almost immediately following the acquisition of the Carroll Building by lease, H. E. Kennedy, a contractor previously referred to, was engaged and commenced repairs and renovations on the building.
Chester E. Abresch, who had planned the production line for squad tents at the Fourth Street plant in St. Louis, planned the remodeling of the Carroll Building and cooperated with the construction contractor in his work. He was then the production manager for the Canvas Products Company, but acted in an advisory capacity in preparing for production at the plaintiffs’ plant in Litchfield as well as throughout the performance period of the contract. The remodeling of the building and all preparatory installations were planned for the production of squad tents, but were also adequate for manufacturing other products in the canvas goods industry.
The building had suffered by neglect and all construction work done was considered necessary for efficient operation *568 of the plant and the safety and welfare of employees. Most of the construction work was performed in January and February, but the outside fire escape was not completed until about the end of May 1945. Plaintiffs’ payments for this work were approximately $28,923.47,! including approximately $7,000 for electrical subcontract work.
The other principal items of construction consisted of the replacement of all outside doors, the enlargement of a front entrance door from the base-grade line to the second floor, the installation of a receiving and shipping entrance and a steel chute to the basement with sidewall doors, the installation of an elevator shaft and elevator to both floors, the removal of partitions and the installation of supports adequate to carry the load weight, the installation of a lead-in power line and the rewiring of the entire building to operate the power machines, the elevator and the lighting systems. The entire first floor was recovered with oak flooring and certain other areas, which had been damaged by roof leakage, were repaired. The stairs required repair and considerable portions of the ceilings required replacement. The inside walls and ceilings of the building were painted. The furnace room was blocked off with a hollow tile partition and a plastered ceiling was installed. The furnace was overhauled. Plumbing and lavatory fixtures were installed throughout the building. The roof was in a weakened condition, which necessitated reinforcements for much of the framing and the installation of trusses and bearing posts before continuing any of the inside renovation. Other inside work performed by the construction contractor included a tool room, a machine repair room, the construction of revolving tables, shelving and a large metal-covered cutting table. The cornice along the top of the building had to be removed and all brickwork back of the cornice and extending down the wall about six feet was in bad condition and had to be replaced. The outside woodwork was painted with an oil paint.
By letter of December 15, 1944, to plaintiff Schultz, Mr. Kennedy submitted a statement of repairs performed from December 7 to December 14 which was billed by him to Carroll & Son in the amount of $1,127.69, advising that the *569 roof was put back in shape and the ceilings straightened on the second floor. There is no other evidence of repair work performed by the owners as required by the third paragraph of the lease agreement.
15. In addition to the partners, plaintiffs’ supervisory force consisted of Peter W. Biggs, general manager, Walter Anielak, plant foreman, Thomas A. Bailor, production superintendent, and Chester E. Abresch, the production engineer for plants of the Canvas Products Company in St. Louis, who performed advisory services at the Litchfield plant throughout the period of the contract performance. Peter W. Biggs had no experience in production but was the brother of William Biggs, a partner in the law firm of Dunbar & Biggs. He resigned about August 15, 1945, upon the partial termination of the contract. Walter Anielak was the former superintendent for the Canvas Products Company but had resigned about the middle of 1944 to engage in the business of manufacturing fatigue clothing for the Army. Upon the solicitation of Schultz he commenced work with the partnership on December 15, 1944, at $850 per month and began preparatory work at the Litchfield plant. Thomas A. Bailor was an inspector for squad tent production at the St. Louis plants of the Canvas Products Company during the fall of 1944 and until his resignation from the office of the Depot Quartermaster, Jeffersonville, Indiana, on December 21, 1944. Schultz had no prior acquaintance with him, in business or otherwise. He was informed that Bailor had formerly operated a tent and awning business in Tennessee and was interested in engaging in the manufacture of squad tents.
About October or November 1944, Bailor propositioned Schultz to admit him into the production of squad tents, but Schultz would not consider his employment by the Canvas Products Company where he was then engaged as a Government inspector. Sometime in November 1944, when Schultz had the prospect of opening a new plant and discussions were had with respect to the formation of a partnership, he agreed to admit Bailor as a junior partner. No written agreement was made, however, regarding his participation in the partnership.
*570 Bailor commenced work with the General Canvas Company as of January 1, 1945, and continued until August 15, 1945, at a salary of $450 per month. During the first two and one-half months he was on a drawing account, but his compensation was later adjusted to the regular salary basis. There is no evidence he participated in the profits and losses of the partnership or had any authority as a partner. Bailor had shipped in a few sewing machines for use of the General Canvas Company but never contributed any cash investment and he was never actually admitted to the partnership. Plaintiffs paid Bailor $200 as rental for the machines while they were employed on the contract performance. This matter became the subject of an FBI investigation but it was determined that the amount paid was no more than rentals paid by other contractors for such machines.
There is no evidence that Bailor participated directly or indirectly in the negotiation of the contract in suit, in the acquisition of the building or in the formation of the partnership. He did not make any trip to Litchfield until after January 1, 1945. The Quartermaster officials concede that there was nothing irregular in Bailor’s conduct or in his employment with the plaintiffs herein. Defendant has made much of Bailor’s relationship with plaintiffs but did not plead fraud and none is found.
16. There were no experienced power machine operators in the Litchfield area, except one person who had worked a few months at the Fourth Street plant of the Canvas Products Company. Plaintiffs’ supervisory personnel employed workers locally and set up a training program as soon as a portion of the building was available in January 1945. Several rolls of commercial material and tent scrap cloth were used in training work. The production of squad tents was commenced between February 10 and February 15 and the first shipment was invoiced to the Government on March IB, 1945.
The trainee employees were engaged in making quilted tarpaulins and dropcloths which were sold to H. E. Kennedy for $526.78. The Army Audit Agency, sometimes referred to herein as the AAA, excluded from the contract costs the sum of $6,407.59 representing the first week of pay for each *571 productive worker, but this cost was restored in the final determination as a proper cost incidental to the training period for contract workers.
The wage scale of classifications and rates required travel to Chicago for final approval. Trips were made to New York to expedite the shipment of machines. Other trips were made to Jeffersonville and Kansas City for conferences with Government officials.
Certain special equipment was installed for the production of squad tents, consisting of large turntables one of which was placed at each of the power machines in the setup line to cany the heavy materials, an overhead monorail system with switch lines to each machine operator for the delivery of materials and removal of the completed work, and a tent folding machine used in wrapping the completed unit.
17. Plaintiffs’ deliveries of squad tents increased progressively until August 1945 when partial termination notice was received. The contract delivery schedule, as revised by modification E and increased in quantity by modification B is compared with actual deliveries in the following table:

Upon consideration of all of the evidence it must be concluded that the accomplishments of the General Canvas Company resulted in a large measure from the efforts and experience of the officials of the Canvas Products Company, Schultz, Dunbar and Abresch.
18. On August 24, 1945, the plaintiffs submitted a bid on the estimated surplus tent cloth material, with the request that it be released within 15 days so that the plant could be converted and employees retained to process this material for civilian use. The unit bid price of one class of twill cloth was increased by one-half cent a yard on September 19 and *572 the bids were accepted by the Jeffersonville Quartermaster termination branch on September 20,1945.
Other bids were submitted on October 26 and November 15, 1945, for surplus Government-owned thread and additional twill cloth which were accepted by the Government, all of which were included in a formal contract of sale February 6, 1946. The contract covered 204,025 yards of duck, 216,731 yards of twill, 5,412 pounds of thread and 100 tent covers, all at unit bid prices and at a total value of $99,183.60.
.The sales contract provided for payment immediately upon its execution. . Upon repeated demands for payment, the plaintiffs wrote the Government disposal agency that payment would be made for the difference between the amount due and their termination claim of $51,000, and on May 13, 1946, a certified check for $65,000 was sent on account. The balance of $34,183.60 remains due and owing to the Government on this sales contract.
19. Pursuant to instructions contained in the notices of termination, the plaintiffs prepared inventories of materials which were submitted to the termination branch about October 26,1945. The inventories consisted largely of Government-owned materials, including work in process on approximately 155 units and 4,825 completed shipping bags. The plaintiffs submitted bids for most of the surplus materials. The bid for work in process was not accepted, and this material was sold direct by the Government to the American Tent and Awning Company. The material consisted of 33,860 pounds of cloth and 730 pounds of rope. Plaintiffs were directed to pack and ship this lot on March 5,1946.
In addition to the sale to plaintiffs of the unused surplus materials described in finding 18, the Government authorized plaintiffs to dispose of the remaining inventories in the following manner:
On February 20,1946, plaintiffs were authorized to retain the 4,825 shipping bags at the bid price of 20 cents each for a credit of $965. On February 21, 1946, plaintiffs were authorized to sell 250 yards of twill cloth to the Louisville Tent and Awning Company for $57.50. On February 25, 1946, another small lot of materials was authorized to be sold to *573 the American Tent and Awning Company at $57.44, and on December 27, 1947, plaintiffs were authorized to sell 8,616 yards of sod cloth and 1800 D-rings with webbing attached to Oscar Lipman for the price of $125. Thus, the plaintiffs received, by retention and sale of surplus materials, the sum of $1,204.94 as disposal credits.
20. The plaintiffs did not offer an assignment of their lease to the Government nor offer to transfer title to any machines, removable fixtures or supplies which had been acquired for the performance of the contract, but elected to employ these assets in the operation of the plant for civilian production as hereinafter reported.
However, in the termination settlement proposal submitted by plaintiffs, claim was made for 50 percent of the rental payments from September 30, 1945, to the termination of the lease agreement; also 50 percent of the amortization of the cost of the lease improvements over the same period, on the premise that the plant was being utilized at only 50 percent of capacity for civilian work.
21. Upon final termination of the contract, plaintiffs converted the Litchfield plant for civilian production of tarpaulins and other smaller canvas products, using the Government surplus materials which had been purchased.
The overhead monorail system was dismantled and removed, and the large turntables, which were employed to carry the heavy tents, were removed and destroyed since they could not be used in civilian production. Most of the machines were suitable for civilian work. Two machines which had been rented from the Government for contract work were released. Several other machines, which were not adaptable for civilian production, were removed and stored and the tent folding attachments were removed from the machines. The preparation of inventories and the conversion of the plant required approximately two weeks.
The services of Biggs, the general manager, and Bailor, superintendent of production, were terminated on August 15,1945. Chester E. Abresch was given full authority from August 15, 1945, to direct the operations of the' Litchfield plant, although he continued as production manager for the Canvas Products Company. Anielak continued there in *574 charge of production and remained on civilian production until about July 1946.
During the period of full production on contract work, the plaintiffs employed between 180 and 200 workers and operated two shifts. About 30 to 35 employees were retained on civilian work, but this was later increased to about 50 employees, or approximately 60 percent of the plant capacity.
In November 1945 Abresch recommended that the Litch-field plant to closed. The only canvas material that could be obtained was Government surplus, which each contractor sought to acquire. Abresch had closed the Fourth Street plant of the Canvas Products Company following the termination of its Government contracts, and less than one-third of its employees were recalled for civilian work at the Seventh Street plant. Schultz declined to close the Litchfield plant and was determined to continue its operation even though it might be operated at a loss. Abresch continued the general supervision of plaintiffs’ plant in Litchfield until March 10,1946, when he terminated his services with Canvas Products Company.
Following the termination of the services of Abresch and Anielak, plaintiff Schultz employed a Mr. Hober to run the Litchfield plant and it was continued in operation until about May 15,1947, when it was finally closed.
All machinery, equipment and removable fixtures, having a book value of $14,226.16, were moved to the St. Louis plant of the Canvas Products Company and were sold September 30,1947, for the sum of $16,330.53.
Commercial sales by the General Canvas Company for the period October 1945 to May 1947 were $237,000, as follows:
1945_$27,000
1946_ 144, 000
1947_ 66,000
Total_ 237,000
22. By letter of October 24, 1946, plaintiffs notified Albert T. and Eva T. Carroll of their intention to exercise the option to renew their lease of the Carroll Building for a period of five years under the agreement of December 8, *575 1944. The owners acknowledged this notice on October 29, 1946, thus extending the lease from January 2,1947, to January 1, 1952.
The lease was renewed in the interests of the Canvas Products Company, although there is no evidence that the lease was actually assigned to it. Canvas Products Company had obtained a contract with Sears, Koebuck and Company for the manufacture of small umbrella tents and acquired additional material which would engage the Litchfield plant for about a year. Mr. Schultz decided to have the work performed there so that plaintiffs’ plant, in effect, operated as a subcontractor or subsidiary of Canvas Products Company during this period. Canvas Products Company paid the rental for the Litchfield plant, commencing about October 1946 and continued the rental payments after the plant was closed and until the extension of the lease expired.
The plaintiffs could have subleased the building for other purposes at a rental substantially in excess of $200 a month, except for the restrictive wording in the lease providing “for manufacturing and handling of canvas goods.” The owners of the building both died and Lee Carroll, who was interested in the Carroll estate, was anxious to obtain possession of the building and was willing to cancel the lease immediately if plaintiffs would agree to its cancellation. Plaintiffs declined to agree, and the impasse continued until its expiration.
23. On February 19, 1946, plaintiffs submitted a termination settlement proposal (total cost basis) on form 1-b, which was one of the forms prescribed by the Office of Contract Settlement. Plaintiffs claimed $42,945.88 in this settlement proposal. The proposal was prepared by Norman C. Parker, an attorney in plaintiff Dunbar’s office- On March 3, 1946, Mr. Dunbar wrote the termination branch, revising the said claim upwards by $8,500 to include an allowance of $4,000 attorney’s fees and $4,500 partners’ salary allowance for plaintiff Schultz. Additional post-termination expense was later claimed in the amount of $350, thereby increasing the claim to $51,795.88.
24. Following the submission of plaintiffs’ termination settlement proposal, a number of field audits and investigations *576 were made by the defendant. The first field audit was reported on March 11, 1946, by Morris G. Alexander, cost analyst in the office of the Jeffersonville Depot Quartermaster. A further field audit was reported in May 1946 by Harold Love of the same office. Negotiations were suspended on June 3, 1946, until April 3, 1947, for investigation of possible violations of the Contract Settlement Act. The EBI investigation involved the alleged misconduct in office by Alexander, who made the first field examination of plaintiffs’ claim.
Thereafter the claim was transferred to the Chicago Depot Quartermaster’s office for settlement. Negotiations were entered into between plaintiffs’ representatives and the defendant’s officials at the Chicago office on June 4 to 6 and on July 1,1947, but they failed to agree and the matter was referred to the Army Audit Agency for an independent field audit. Edward Basofin of the St. Louis branch of the Army Audit Agency, performed the field audit, which was reported December 10, 1947. It is defendant’s exhibit 11. He was a witness at the trial. A further conference was held in Chicago with plaintiffs’ officials on January 7, 1948, but no agreement could be reached.
Negotiations were again suspended on January 28, 1948, as a result of irregularities noted in the Army Audit Agency’s report, sometimes hereinafter referred to as the AAA audit. On June 14, 1949, the Quartermaster General transmitted a copy of the FBI report on the irregularities referred to and directed that negotiations be resumed. Thus, the defendant suspended the negotiations with plaintiffs a total of 807 days for the investigation of alleged violations of the Contract Settlement Act. The irregularities pertaining to plaintiffs, as reported in the AAA audit on page 7 thereof, referred to certain deposits in the personal account of the plant manager, P. W. Biggs, in sums totaling $526.78 which were not recorded in the books of the contractor. These deposits represented the sale of tarpaulins and dropcloths, manufactured by plaintiffs’ employees during the training period, from commercial cloth and scrap duck. The plaintiffs failed to include these credits in the costs submitted in *577 their proposed settlement, but also excluded the cost of the commercial cloth and scrap duck purchased from the Canvas Products Company for use in training employees.
The plaintiffs’ settlement proposal, the AAA audit and all data relating thereto were referred to the cost and price analysis section of the Chicago Depot Quartermaster’s office in June 1949. Thereafter, Donald R. McMillan made a further field investigation at Litchfield and St. Louis in the fall of 1949, adopted the AAA audit in part, adjusted it in part and issued an undated report which was- received in evidence as defendant’s exhibit 12.
A further conference was held with plaintiffs’ representatives in Chicago on March 23,1950, and upon the request of plaintiff Dunbar, further conferences were had with their accountant at plaintiffs’ St. Louis office during the period April 3-6,1950.
Plaintiffs were unable to furnish detailed vouchers covering certain expenses claimed for travel and legal services. Repeated requests were made for these data, and plaintiffs were given until July 31, 1950, to comply with them, but failed to furnish any additional information on such costs. Card records were kept by the law firm of Dunbar & Biggs for legal work and expenses incurred on behalf of plaintiffs, but upon the dissolution of the partnership by the withdrawal of Biggs in December 1945 plaintiff Dunbar was unable to locate these detailed records.
Thereafter, McMillan prepared the findings of fact, based upon the “formula” method specified in the termination clause of plaintiffs’ contract, upon consultations with the legal branch of the Depot Quartermaster’s office in Chicago. The findings were dated April 12, 1951, signed by J. J. Adams, successor contracting officer, and were sent to plaintiffs by registered mail. These findings were received as defendant’s exhibit 10, and a copy is appended to plaintiffs’ petition as exhibit B.
25. The following table sets out the comparison of plaintiffs’ claim with the determination of allowances in the findings of the successor contracting officer:

*578

The plaintiffs’ claim was prepared and submitted on form 1-B providing the above pattern for a total cost basis. Detailed schedules were furnished for items (c), (f) and (i) with an explanation for disposal credits. However, no allocation of costs was submitted to justify the claim of $40,-487.15 applicable to the terminated portion of the contract, except that 50 percent of the building rental and lease improvements from October 1,1945, until the termination of the lease, amounting to $10,581.65, was included in the total costs.
The defendant determined the sum of $4,391.86 as applicable to the terminated portion of the contract. This is included in the following items of the foregoing tabulation:

*579 The foregoing allocations to the terminated portion of the contract fail to include any allocation of plaintiffs’ initial costs for lease improvements, the cost of the production setup, the organization and training of employees or any overhead costs during the first four months, before normal production was attained. No amount is allocated for the cost of receiving and storing approximately 430,000 yards of materials, equivalent to about 2,116 completed tents on the basis of the Government’s bill of materials allowed, which were on hand or in process on the date of termination, as reported in findings 18 and 19 herein.
It must be concluded that the finding of the contracting officer with respect to the foregoing allowance is so grossly erroneous as necessarily to imply bad faith, is arbitrary, and is not supported by substantial evidence.
26. The defendant’s auditors made numerous transfers of costs for the purpose of classifying such costs under accounts deemed proper. These transfers have no effect on the aggregate costs, except in those instances where the reclassified items were capitalized and only depreciation thereon was allowed as performance costs.
Since the plaintiffs failed to explain adequately the costs claimed to be applicable to the terminated portion of the contract and the defendant allocated only a portion of such costs, as reported in the preceding finding, such allocations are reported in the following findings according to the determination from the evidence for each classification.
27. Direct material. The defendant allocated to the terminated units of the contract the cost of 4,825 shipping bags at 67 cents, amounting to $3,232.75. The plaintiffs’ cost of brass and zinc grommets applied to 155 units in process was $166.77. The correct allocation of materials is $5,133.60 to the units completed and $3,399.52 to work terminated.
28. Direct labor. In the findings of the contracting officer the sum of $528.41 was reclassified and transferred from direct labor to the leasehold improvements account. This item represents expenditures for the construction of worktables, especially designed for the squad tent contract work, which were of no value to the plaintiffs in the commercial work that followed termination. The defendant concedes *580 that this cost was not for leasehold improvements, but was applicable to the contract work. The cost of $528.41 is allo-cable, in part, to the terminated portion of the contract.
The training of production workers continued over several months of the performance period and normal production was not obtained until about the end of May 1945. Plaintiffs expended $2,080.28 on direct labor by February 7, 1945, before any work was started on squad tents. Additional workers were employed and given training thereafter.
The AAA auditor allocated the first week of pay of each productive worker during this training period to purposes other than squad tent manufacture, which amounted to $6,407.59. Some production of tarpaulins and dropcloths by the trainees was sold for $526.78. The net sum of $5,880.81 is found as a reasonable initial cost for training direct labor and this is allocable in part to the terminated portion of the contract. There were 6,086 units cancelled out of a total of 10,450 called for in the contract, or 58 percent thereof.
The net cost of training employees and labor applicable to the construction of worktables for squad tent production was $6,409.22, of which sum $3,717.35 is allocable to the terminated portion of the contract. By adding $1,013.38 of labor performed on work in process, the total direct labor allocable to the terminated portion of the contract is $4,730.73. The remaining $112,930.31 of direct labor cost is allocable to the 4,364 units completed.
29. Indirect factory expense. Approximately 20 accounts are included in this classification, many of which were adjusted in the findings of the contracting officer. The classification on form 1-b entitled “Dies, Jigs, Fixtures, and Special Tools” was reclassified by the defendant’s auditors and transferred to factory expense under the account for small tools, parts and supplies. The amount claimed was verified in the sum of $9,459.57, and a complete analysis is contained in the tabulation on page 73 of the petition.
The plaintiffs failed to take an inventory of the expendable supplies and machine parts contained in this account and the entire account was charged off to profit and loss on November 30,1945. Allocations made by the Government auditor, McMillan, were adopted by the contracting officer in his *581 findings stated on pages 37-42 of the petition, showing the net allowance of $5,912.55 as contract costs.
A transfer of $22.50 of these costs was made to the machinery account, and $65.98 for beeswax was transferred to the materials account, of which $45.88 was allowed for use on tents completed and in process on the basis of the Government’s bill of materials required. The sum of $1,159.06 was excluded as termination inventory of supplies and parts, determined largely upon the use of similar items by other canvas goods manufacturers. Plaintiffs had no inventories and did not otherwise contest the foregoing allocations.
The cost of dies required for the installation of grommets was determined at $1,300.78, and this item was capitalized and depreciated on the basis of two years of life. McMillan, who prepared findings adopted by the contracting officer, admitted in his testimony that grommet dies could not possibly be used for two years. The breakage was very great and the defendant concedes that a reasonable value of grommet dies on hand upon termination of the contract was $200. Since no inventory was taken and they were not offered to the Government, this amount is chargeable to plaintiffs. The sum of $1,100.78 is reasonable for dies expended, thereby increasing the expense for small tools, parts and supplies to $7,013.33.
30. The contracting officer also eliminated from the small tools, parts and supplies account the sum of $998.70, which was capitalized for plaintiffs’ account and depreciated at ten percent per annum. It consisted of $632.94 for lumber and $365.76 representing 50 percent of the cost of certain mill supplies and hardware.
The evidence clearly establishes that the lumber and the mill supplies, which consisted largely of sheet metal, were substantially all used in the construction of worktables, especially designed for the squad tent contract work. The direct labor applied in the construction of these tables is reported in finding 28. The materials must be similarly treated.
The defendant contends that since the plaintiffs had made one long cutting table, which was also employed for commercial goods after termination, these costs should be alio- *582 cated. The plaintiffs employed about 35 power sewing machines, and the operator of each machine was provided a large turntable with a sheet metal top that carried the tent and could be easily manipulated for sewing the cloth. The costs so allocated are approximate and some tolerance of error must be allowed.
The defendant also contends that the cost of these worktables should be backcharged to the plaintiff since there is no evidence that they were transferred or tendered to the Government upon termination. The evidence does show that the Government was disposing of all of its squad tent materials and had discontinued squad tent production. In this circumstance it would not be logical that plaintiff would tender facilities of no value and that could serve no useful purpose. In any event, the tables were required for the performance of plaintiffs’ contract and were of no value thereafter. The sum of $419.45 is allocable to the 4,364 completed units and $519.25 is allocable to the terminated portion of the contract.
31. As a result of his study of the labor maintenance account, the AAA auditor reported as follows:
Wages of carpenters, electricians, machinists and their respective helpers for labor performed on the installation of machinery, building of tables, cabinets, benches, etc. are properly chargeable to the Machinery and Equipment account. In the absence of proper labor distribution records, the AAA accountant has estimated an amount of $1,000.00 for these wages and has reclassified this account to the Machinery and Equipment account.
The auditor allocated $200 a month for February and March and $100 a month from April through September 1945 for capitalization. The auditor based the allocations on the nature of the labor paid for, as shown on the payrolls. This reclassification was adopted by. the contracting officer and it was depreciated at the rate of ten percent per annum, amounting to $38.18 allowed for contract performance.
The allowance of $38.18 is arbitrary and capricious. The mere fact that mechanics performed the services does not justify a change in the classification of the labor from maintenance to a capital asset.
Some of these installations were performed by the building contractor and would be included in lease improvements. *583 Plaintiff Schultz concedes that mechanics were employed to install machines but that each change of work required the realignment of machines to suit the new pattern. In the canvas industry this type of expense is classified as “setup” expense and is included in factory overhead.
It is reasonable to conclude that the setup expense for squad tent production would be adequate for the entire contract with minor changes during performance. It is reasonable to allocate this cost in proportion to the quantity completed, or $420 on the completed units and $580 on the terminated portion of the contract.
32. The plaintiffs claimed depreciation on machinery and equipment at the rate of 1.5 percent per month. The Government owned some machines suitable for sewing squad tents, which it rented to contractors at 1.5 percent of value per month, and the plaintiffs rented two of these machines for the contract work. The contracting officer allowed depreciation at the rate of ten percent a year, computed monthly as set out on pages 71 and 72 of the petition.
The plaintiffs’ machinery costs were $12,678.37 and equipment costs were $7,839.81. The defendant’s auditors transferred freight charges of $346.89, properly applicable to the machinery and equipment received. The depreciation of $961.20, computed at the rate of ten percent per annum, for the performance period to September 30, 1945, is a fair and reasonable charge to units completed.
The contracting officer also capitalized for the plaintiffs’ account the sums of $1,000 for factory maintenance labor, $998.70 for lumber, sheet metal and miscellaneous parts, and $1,300.78 for the cost of grommet dies, on which additional depreciation of $294.96 was computed and allowed. This depreciation must be eliminated, since these items were improperly capitalized.
33. Plaintiffs claimed $1,445.64 in an account entitled “Labor — Outside Work,” which consisted of $90 for the cost of labels and $1,355.64 for the cutting of binding by the Star Binding Company. The contracting officer construed the cutting service performed by the Star Binding Company as subcontract work which had not been authorized and allowed *584 plaintiffs $508.37 as labor for cutting the materials in tbe Litchfield plant.
The total amount billed by Star Binding Company was reduced 25 percent, or $338.91, to allow for its general administration expense and profit, and 50 percent of the remainder, or $508.37, as factory overhead. The remaining $508.37 would represent cutting labor, which the defendant contends should have been performed in the Litchfield plant.
The Star Binding Company performed the special service of cutting binding for the canvas industry generally. Certain binding for the squad tents required the cutting of Government-furnished materials in narrow strips. It required a special machine with a series of cutting blades that could be set for any width desired. An entire roll of material was cut in one operation and the material was left in the narrow rolls ready for sewing. The cost of cutting binding by hand in the Litchfield plant would have cost many times the amount charged by the Star Binding Company. The inspectors at plaintiffs’ plant knew that part of the Government’s material was shipped to the Star Binding Company for cutting binding strips.
The exclusion of $847.27 of plaintiffs’ cutting costs was arbitrary and capricious and so grossly erroneous as necessarily to imply bad faith. It is restored as a proper and reasonable cost of the contract work.
The contracting officer also excluded freight costs of $526.59, representing shipping charges on Government-furnished materials shipped out for cutting and the charges for the return of the cut materials to the Litchfield plant, on the premise that the cutting should have been performed at Litchfield. This sum is also restored as a proper contract cost. The sum of $1,329.77 allowed by the contracting officer for freight, express and drayage is properly increased to $1,856.36.
34. The contracting officer excluded $175 from factory superintendence expense, representing the salary of Walter Anielak from December 16 to 31,1944, since he was employed as production superintendent before the contract had been awarded. Plaintiffs do not contest this deletion, even though *585 Anielak was specifically employed for the contract work and did engage in the preparatory work.
During the early months of the contract period the plaintiffs’ supervisory personnel were largely engaged in preparatory work consisting of the “setup” for production, the hiring and training of personnel until full employment was obtained and other things necessary to obtain full use of facilities and efficient operations. Production to the end of May 1945 was equivalent to little more than a full month of normal production after the plant was in full swing. Approximately four months of supervisory salaries are properly allocable to the entire contract.
The plant manager, Thomas A. Bailor, was paid $450 a month and Walter Anielak was paid $350 a month. A reasonable allocation of supervisory salary to the entire contract is $3,200 ($800 X 4), and the proper sum allocable to the terminated portion thereof is 58 percent, or the sum of $1,856.
35. Amortization of leasehold improvements. The plaintiffs’ book record of leasehold improvement costs was $28,-901.31. The defendant’s auditors made certain transfers to this account and minor adjustments resulting, in a determination of such costs at $29,451.88. These adjustments included the sum of $528.41 for labor improperly transferred to this account. The corrected costs are determined in the sum of $28,923.47.
The plaintiffs claimed $19,837.26 of these costs, based upon the two-year period of the lease, which represents nine twenty-fourths of the cost at 100 percent of the monthly amortization until termination, and fifteen twenty-fourths of the cost at 50 percent of the monthly amortization for the remaining period of the lease.
The contracting officer allowed amortization of the leasehold improvement costs in the sum of $729.19, no part of which was allocated to the terminated portion of the contract. His determination was based in part upon the fact that some of the improvements paid for included outside work which should have been paid for by the lessors under the third paragraph of the lease, and thus excluded $11,506.13, representing payments by plaintiffs in January 1945. The remaining costs were then amortized over a twelve-year life, *586 computed on a monthly basis from the month in which payment was made to September 30, 1945. The determination of the contracting officer is arbitrary and capricious and is not supported by substantial evidence. It represents but a minor portion of plaintiffs’ costs properly attributable to the contract.
The plaintiffs entered into a firm lease for two years, in anticipation of acquiring additional squad tent contract work. Their original contract for 7,500 units provided a performance period ending September 30,1945. • The number of units was increased to 10,450 and the time extended to the end of February 1946 by modifications of the contract. No part of the leasehold improvements beyond February 1946 is properly applicable to the contract.
The defendant contends that, since plaintiffs exercised an option under the memorandum of agreement of December 8, 1944, extending the lease five years, and since this agreement provided for a further extension of five years at the option of the lessee, the leasehold improvements should be amortized over a twelve-year period. This is inconsistent with recognized commercial accounting practice. Plaintiffs exercised an option in October 1946 extending the lease five years to January 1, 1952. This was more than a year after termination of the contract and would be based upon conditions existing at the time of the extension without regard to the alleviation of any contract costs or the absorption of such costs in the commercial product.
36. The lessors were billed for certain outside repairs performed in December 1944 amounting to $1,127.69. The evidence does not disclose the cost of other outside repairs or that any part of the payments made by the plaintiffs was refunded or assumed by the lessors. The plaintiffs performed only those repairs and improvements which were adequate and necessary for the efficient performance of the contract work and for the safety of employees. There is no evidence that the lessors failed to perform the necessary repairs under the third paragraph of the lease, and it is reasonable to conclude that they did so.
The leasehold improvement costs of $28,923.47 were paid during the performance period, as follows:
*587 1945: Amount 8
January_ $11, 506.13
February__. 6, 810. OT
March_ 309. 73
April_ 2, 546. 57
May_ 1.150.40
June_ 5.404.41
August_ 1, 397. 89
September-326.68
Adjustment ( — 528.41)
Total_ 28, 923.47
The lease was for a period of two years, and the improvements are properly amortized at a monthly cost of $1,205. The contract performance period as extended was from January 1945 through February 1946. The amortization chargeable to the contract was $16,870 ($1,205X14). Since actual deliveries to August 1945 exceeded the revised scheduled deliveries (finding 17), it is reasonable to conclude that plaintiffs would have completed the scheduled deliveries by the end of February 1946. Since production was not commenced until about the middle of February 1945 and normal production was not attained until about June 1945, a reasonable basis of allocating the amortization of leasehold improvement costs applicable to the contract is on the number of units completed and the number of units terminated. The sum of $7,085.40 is applicable to 4,364 units completed and $9,784.60 to 6,086 units terminated.
The plaintiffs obtained the release of Government surplus materials upon approval of their bid, made necessary conversions to the plant, and commenced civilian work early in October 1945 (finding 21). Plaintiffs operated the plant at about 60 percent of normal capacity during the remaining contract period, and employed most of the facilities previously required for the squad tent contract. The amortization costs for the months of October 1945 through February 1946 are $6,025 ($1,205X5 mo.). The Government is entitled to a credit of 60 percent thereof, or the sum of $3,615, against the cost of the terminated portion of the contract, thereby reducing such cost to $6,169.60 ($9,784.60 — $3,615).
37. The plaintiffs paid $200 per month rental for the Carroll Building in Litchfield, where production was performed. *588 The amount paid during the contract period ended February 28, 1946, was $2,800. Due to the preparatory work, which continued about four months prior to the time normal production was obtained, the allocation of rental is properly based upon the units produced and delivered prior to termination and to the number of units terminated, as reported in the preceding finding.
The sum of $1,176 is allocable to the 4,864 units completed and $1,624 is allocable to the 6,086 units terminated.
Since the plaintiffs went into production of commercial work, following the termination of the contract, and operated the plant at approximately 60 percent of normal capacity, the Government is entitled to a credit of $600, or 60 percent of the rental for the period October 1945 through February 1946 thereby reducing the rental allocable to the terminated portion of the contract to $1,024.
38. The social security taxes on direct and indirect labor allocable to the terminated portion of the contract amount to $68.34 and unemployment compensation taxes amount to $205.03.
39. The indirect factory expense with proper adjustments and reasonable allocations determinable from the evidence, are summarized in the following tabulation:

*589 40. General administrative exfense. The only accounts wherein allowances are contested by the plaintiffs on the total cost basis under this classification are for traveling and entertainment and compensation to partners. However, since neither the plaintiffs nor the defendant have made proper determination for allocations of costs applicable to the completed work and the terminated portion of the contract, certain other accounts are considered and reported as to such allocations.
Chester E. Abresch was paid the sum of $2,580.74 by plaintiffs, of which $2,500 was compensation and $80.74 was refund of expense. He was regularly employed as production manager for Canvas Products Company and received compensation of $400 per month in addition to the compensation received from plaintiffs. Abresch had laid out the setup at the Fourth Street plant of Canvas Products Company in St. Louis for the production of squad tents, which resulted in profitable operations and was highly satisfactory. Plaintiffs requested that he engineer the plan for a similar setup at the Litchfield plant and he was primarily employed for this work. Abresch also assisted in other ways in getting the plant into production. He traveled to New York and Chicago in connection with workers’ classifications and wage scales at the Litchfield plant. He was paid $2,500 for the entire job. Upon partial termination of the contract Abresch was placed in general charge of the plant about August 16, 1945, and P. W. Biggs, the former general manager, left about August 20, 1945.
The service performed by Abresch was primarily the setup of production for the entire contract. The cost of $2,580.74 is properly allocable to completed units in the sum of $1,083.91, and to the terminated portion of the contract in the sum of $1,496.83.
41. Office salaries at the Litchfield plant were verified and allowed by the contracting officer in the sum of $8,741.71. Peter W. Biggs was employed from January 1, 1945, to August 20,1945, as general manager and Eussell F. Grimm was office manager and bookkeeper. Since normal production was not attained until about the end of May 1943 about four months of office salaries, amounting to approximately *590 $3,885.20, are subject to allocation over the entire contract. The amount allocable to the terminated portion is 58 percent thereof, or the sum of $2,253.42.
42. Shipping department salaries of $15,044.05, including $5,530.12 transferred from direct labor by the AAA auditor, plus shipping expenses of $790.73, are allocable in part to the terminated portion of the contract. The plaintiffs completed and shipped 4,364 units, all made from Government materials. These units required handling twice, first the receiving and storing of materials and then the shipment of the finished tents. Other Government materials on hand represented the equivalent of 2,020 tents, based upon the bill of material requirements set forth in the contract specifications. In addition there were materials in process for approximately 155 tents, making a total of 2,175 tents in materials on hand upon termination, or approximately 20 percent of the total materials handled. The costs of the shipping department allocable to the terminated portion of the contract would be represented by 20 percent of $15,834.78, or the sum of $3,166.96.
43. The plaintiffs claim expenditures of $2,988.61 under the account classification of travel and entertainment. The sum of $300.59 was found properly supported by vouchers and was allowed by the contracting officer. All other items paid by the Litchfield office, amounting to $1,496.48, were disallowed for lack of explanatory details of the purposes for which payments were made. All items paid by the St. Louis office of the partnership were disallowed for the same reason, such payments amounting to $1,191.54.
The general office of the partnership, General Canvas Company, was operated during 1945 in the law offices of Dunbar & Biggs, 520 Security Building, 319 North Fourth Street, St. Louis, Missouri.
Plaintiffs now waive all payments to the University Club by the St. Louis office. The payments of $159.10 to “cash” on June 19 and $150 to Thomas A. Bailor on June 21, 1945, for time off are not established as proper charges to the contract. The remaining expenditures previously disallowed have been substantially proved and are fair and *591 reasonable for the purposes incurred. They include the following payments:
Elks Club at Litchfield_ $734. 40
Canvas Products Company_ 202. 98
Officers and employees_ 250. 00
Pennsylvania Eailroad_ 177.45
Schultz & Dunbar_ 492. 02
1,856. 85
The Elks Club was the only available lodging at Litch-field and was used whenever the partners were on temporary duty at the plant and for employees of the Canvas Products Company who were sent to Litchfield for training plaintiffs’ newly employed personnel.
The plaintiffs acquired several rolls of commercial materials and scrap materials from the Canvas Products Company for use in training personnel. These materials were billed to plaintiffs but no part of such costs was included in materials consumed. The payments of $202.98 represent a reasonable allowance for such materials.
The payments to officers and employees represent refunds of expenses for travel, and expenses in connection with the training program. The payment to the Pennsylvania Eail-road was for railroad tickets for part of the travel.
The payments to Schultz and Dunbar represent a fair and reasonable amount for the travel performed by them and by Abresch who accompanied Dunbar. Abresch made one trip to New York to obtain assistance in establishing a wage system at Litchfield. He also accompanied Dunbar to Chicago to obtain approval of a wage scale. Dunbar made at least one trip to New York to acquire or expedite the delivery of sewing machines. He also made several trips to Chicago on the reclassification of plaintiffs’ wage scale, two trips to the Jeffersonville Quartermaster’s office and several trips to Litchfield. Schultz made at least one trip to New York. He also attended conferences held by the Quartermaster officials to expedite the work and to instruct manufacturers on the production of squad tents at Jeffersonville, Kansas City and Chicago.
*592 Tbe total additional expenditures, as determined herein, with, the $300.59 previously allowed by the contracting officer total $2,157.44 for this classification. But a substantial portion of these costs represent costs incurred in training-personnel.
Most of the expenditures in this classification were incurred for the performance of the entire contract. At least $1,614.07 of such costs is properly allocable to the entire contract, leaving $543.37 applicable to the completed work. Fifty-eight percent of $1,614.07, or the sum of $936.16, is properly allocable to the terminated portion. The remaining $677.91 thereof, plus $543.37, is allocable to the completed work.
44. The articles of partnership provided no allowance of salary to the partners and none was paid to them. The plaintiffs would be entitled to all net earnings of the partnership, whether or not partly received as salary or wholly as profits from operations, and the treatment of such compensation would be the same for tax purposes. Thus, there was no advantage or purpose of paying themselves a salary for services rendered toward the performance of the contract unless and until the contract was terminated. Following termination, a claim was made for compensation to Schultz in the amount of $4,500 as partner’s salary and $4,000 to Dunbar as legal fees. The contracting officer allowed Schultz $1,500 and Dunbar $750 as compensation to partners for services rendered toward the performance of the contract.
The determination of the contracting officer was based on the fact that Schultz received $12,000 a year from Canvas Products Company, based upon a six-day week, and that he spent about one day a week at the Litchfield plant. Thus, one-sixth of his regular compensation would be $2,000 a year, or $1,500 for the nine-months’ period of service prior to termination.
With respect to the allowance to Dunbar, the contracting officer determined that many of the services' performed by him and by his firm, Dunbar & Biggs, such as the negotiations for and lease of the building at Litchfield, the contract for repairs and renovations to the building and the purchase of machinery and equipment, should be capitalized rather *593 than charged as a contract expense. Since Dunbar was designated as the person who would administer the contract, and did perform these services as well as legal services in connection with the contract, it was determined that his services were equivalent to a degree with the services performed by Schultz. But since Schultz was the dominant partner and was primarily responsible for questions of policy and organization, the allowance to Dunbar was designated at one-half of the compensation to Schultz, or $750.
The contracting officer allowed' the payment of $2,500 to Abresch for his services toward the contract performance, in setting up the arrangement for production and acting in an advisory capacity to production officials at the Litchfield plant. Abresch had no prior experience in the canvas products business before his employment with Canvas Products Company in 1943. The services performed by the partners were substantially greater in time, effort and knowledge than the services performed by Abresch and were considerably more valuable toward the performance of the contract.
The allowances to the partners for services rendered toward the performance of the contract were neither fair nor reasonable, and the amounts so determined were not in accordance with substantial evidence of the value of their services.
45. Plaintiff Schultz was engaged at the Litchfield plant an average of approximately one day a week during performance and prior to the termination of the contract, but he was in daily communication with officials at the plant and at least at times during the early contract period, as much as 60 to 70 percent of his attention was given to the contract. He made numerous trips to Jeffersonville on proposed changes and for conferences to expedite the work. He assisted in hiring and training employees, engaged in conferences with his plant officials, gave advice and performed whatever services were found necessary to perform the contract properly.
A fair and reasonable allowance as compensation to Schultz for services rendered on the contract is at least $3,750. A substantial portion of his services is properly allocable to the entire contract and to the terminated portion thereof. *594 By equalizing the sum of $3,750 over a nine-months’ period at least $1,666.67 representing four months would be subject to apportionment over the entire contract. The amount allo-cable to the terminated portion is 58 percent thereof, or the sum of $966.67.
46. Plaintiff Dunbar was the principal administrative official of the partnership and the general administration of the contract was conducted from his office where the general records were maintained. The AAA auditor reported on December 10,1947, in part:
4. Description of Contractor's Accowiting System: During the life of the subject contract, the contractor’s accounting system at the plant consisted of a set of double-entry boots comprising a general ledger and a combination journal for original entries. A separate ledger and combination journal was maintained in the offices of Dunbar & Biggs for recording transactions at what was considered the contractor’s “home office” in St. Louis. Both sets of records were independent of each other. The contractor had no cost accounting system.
The cost of maintaining the home office records has not been proved. However, such costs would be chargeable to the contract since this was the only production plant being operated by plaintiffs during that period. Dunbar performed negotiations for the building and the contract for necessary improvements, the cost of which would be properly capitalized and written off over the term of the leasehold, which extended beyond the contract period. In addition, he was primarily responsible for the establishment of a proper wage system for the various classes of work and the wage scale applicable at the Litchfield plant. He performed considerable travel to establish and obtain approval of the wage scale and the acquisition of machinery and equipment. The correspondence relating to the contract, other than that which would be directly concerned with production, was handled in Dunbar’s office and he was required to keep fully informed on production progress, changes and other matters relating to the contract.
A fair and reasonable allowance as compensation to Dunbar for legal and other services performed on the contract is at least $3,000, all of which is properly allocable to the *595 entire contract. The amount allocable to the terminated portion thereof is 58 percent of $3,000, or the sum of $1,740.
47. The plaintiffs’ general administrative expense is summarized in the following tabulation, with allocations to the terminated portion of the contract as determined in the foregoing findings:

48. Settlement expenses. The plaintiffs’ claimed settlement expenses of $2,971.13 included an estimated cost of labor and sundry expense of $450 for packing and shipping Government-owned materials remaining on hand as of February 19, 1946, and estimated attorney’s fees of $500. An additional sum of $250 for attorney’s fees was claimed on May 8, 1946, and an additional sum of $100 for travel expense was claimed July 1,1947.
The contracting officer allowed $2,502.44 for termination settlement expense, which included $284.24 for packing and shipping Government-owned materials and $82 for additional travel expense and certain other adjustments. The total allowance for attorney’s fees was $250 which plaintiffs contest.
The contracting officer held that plaintiffs’ invoice of May 8,1946, for attorney’s fees of $750 failed to detail the values of each of the services listed and stated in part:
The first service listed on the invoice relates to the time spent by the attorney preparing the claim in the study of the Contract Settlement Act of 1944 and the pertinent regulations. As it has been held that charges for time so spent by accountants is not an allowable cost in termination, any charges for the first service listed is not considered to be allowable.
*596 The statement of principles for determination of costs upon termination of Government fixed-price supply contracts, paragraph 1 (k), as reported in finding 3 herein, specifically provides for costs of the accounting, legal and clerical services reasonably necessary for the preparation of a termination settlement proposal.
The termination settlement proposal was submitted by Dunbar, but had been prepared under the supervision of his associate, Norman C. Parker. It is reasonable to conclude that Parker was assisted by plaintiffs’ bookkeeper, Kussell F. Grimm. The preparation of the settlement proposal required the examination of all accounts, the segregation of costs in certain accounts to follow the form prescribed and furnished by the Government and the preparation of sub-schedules. The preparation of the settlement proposal would reasonably require ten days, including the time of the bookkeeper. The services of plaintiffs’ bookkeeper are not otherwise claimed for this work.
The negotiations for a settlement agreement were suspended by the Jeffersonville Quartermaster’s office from June 1946 until April 1947 and the claim was thereafter transferred to the Chicago Depot Quartermaster’s office for settlement, as reported in finding 24. In an attempt to negotiate a settlement agreement, Norman C. Parker attended conferences with officials in Chicago on June 4 to 6, 1947, July 1, 1947, and January 8, 1948. Donald E. McMillan, who was conducting negotiations for the Government, conferred with plaintiff Dunbar in St. Louis on November 8,1949, and Dunbar was required to attend another conference in Chicago on March 23, 1950. Thereafter, McMillan conferred with plaintiffs’ accountant, Gus Y. Keller, at St. Louis, from April 3 to 6, 1950. Plaintiff Dunbar, Parker and Keller were engaged a minimum of 11 days in these additional negotiations.
The plaintiffs’ claim of $750 is found fair and reasonable, but it may be more accurately designated as legal and accounting costs, rather than legal fees. Plaintiffs’ total settlement expense, as determined herein, is the sum of $3,002.44.
*597 49. Offsets, (a) The defendant claims an offset in the sum of $871.47 by reason of excessive usage of Government-furnished materials over and above the usage allowance specified in the bill of materials attached to the contract, as amended, based upon the termination inventories prepared by plaintiffs. The excessive usage or shortage in accountability was determined in the following items:

The AAA auditor reported 155 squad tents in process as of the final termination. No allowance was made in any of the above items for work in process. The plaintiffs sold 682 pounds of %6-inch sisal rope at eight cents per pound and 48 pounds of %6-inch cotton rope at six cents per pound, for a disposal credit of $57.44. Other work in process, 33,860 pounds, was sold under a Government contract for direct payment in the sum of $2,031.60.
The bill of material allowances specified Manila rope of %6-inch diameter (1) for the eave reinforcement (123.12 ft.) at 3.569 pounds per unit, (2) for the drip cap stiffener (3.03 ft.) at .0879 pounds, and (3) for the cover tie lines, eave lines, corner lines and guy lines (609.256 ft.) at 17.66 pounds. Sisal rope of the same size, length and weight was provided as a substitution under the third classification, or cotton rope at the same size and length, but with a minimum weight for each unit of 19.654 pounds.
The bill of material was amended to provide that when 35-to~36-inch-wide duck was used in lieu of the 29.5 inch width in the top of the tent, then only 15.717 pounds of Manila or sisal %6-inch rope (542.248 ft.) would be allowed, but no change was made in the allowance for the use of cotton rope.
The defendant computed and allowed 17.66 pounds of sisal rope for 555.42 tents with 29.5-inch materials, and 15.717 pounds for 1,066.94 tents with 35-to-36-inch materials, and *598 then stated “Balance of 4,864 units applied to %6" cotton rope.” The remaining 2,742 units would require 58,891 pounds of cotton rope substitution. Since sisal rope was also authorized for these units, it would be necesary to determine the quantity of cotton rope as well as the sisal rope used for a determination of an oyerall shortage. This the defendant failed to do and failed to allow for the 682 pounds of scrap sisal rope sold for disposal credit.
There is no satisfactory proof of shortage in the usage of %6-inch sisal rope notwithstanding plaintiffs’ failure to contest the claimed offset.
(b) The defendant claims excess usage of $448.81 for 12,123.5 yards of webbing and tie tapes, equivalent to 313 tents on the bill of materials allowance of 38.683 yards per unit.
The plaintiffs were charged with 144,264 yards, equivalent to 3,729 units. This consisted of 52,140 yards of webbing, after returns and transfers, and 92,124 yards of tie tapes. Under modification F which states “the Government having requested the contractor to fabricate tie tapes out of Duck because of a shortage of %" Webbing, and the contractor having fabricated enough yardage for 1,555 tents,” plaintiffs were allowed an increase in price of 30 cents for cutting %-inch tie tape out of 29.5-inch duck. Modification H revised the bill of materials to provide unit allowance of 38.683 yards of cotton webbing or 2.755 yards of 29.5-inch cotton duck. The shortage of webbing and tie tapes for 313 tents is the equivalent of 862 yards of 29.5-inch cotton duck. The defendant claims no shortage in any of the cotton duck, but failed to show the amount of overage of uncut cotton duck which was sold as surplus. Thus, the claim of shortage in webbing and tie tape cannot be sustained without due consideration of the usage of 29.5-inch cotton duck substitution materials. The maximum amount that plaintiffs may be charged under this item is the sum of $93.90, representing the allowance for cutting 313 units at 30 cents each.
By allowing defendant’s shortages determined for twine and tent rings, the total of amount chargeable to the plaintiffs for excessive usage of Government-furnished material *599 is the sum of $120.69, notwithstanding plaintiffs’ failure to contest the claimed offset.
(c) The defendant claims for offset the sum of $154.66, representing shortages in surplus materials shipped by the plaintiffs. Except for 8,347 pounds of %6-inch cotton rope and tent slips, the determination is based upon plaintiffs’ shipping documents as compared with termination inventories, rather than actual count.
The plaintiffs are properly charged with the sum of $154.66 and do not contest it.
50. The findings reported herein are determined for plaintiffs as follows:

Offsets for the defendant are summarized below:

CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and it is *600 therefore adjudged and ordered that they recover of and from the United States two hundred fifty-nine dollars and ninety-two cents ($259.92).

 The sum of $5,000 was withheld on vouchers billed, but the adjustment of the contract price under modification J reduced this unpaid balance to $2,749.29.